306 Ga. 289
FINAL COPY

S19A0418.  BANNISTER v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Donald Bannister was convicted of felony murder and a firearm offense in connection with the shooting death of Anthony Johnson, Jr.  On appeal, he argues that the weight of the evidence presented at his trial was strongly against the verdicts; that his trial counsel was ineffective in withdrawing a request for jury instructions on voluntary manslaughter and mutual combat; and that the trial court erred by denying a mistrial and giving an improper *Allen* charge after the jury indicated that it was deadlocked, by holding that he had not made a prima facie showing supporting his *Batson* challenge, and by admitting two recordings of phone calls made from jail. We see no reversible error, so we affirm.[1]

---

[1] Johnson was killed on September 24, 2011. On March 1, 2012, a Gwinnett County grand jury indicted Appellant and Ricardo Linton on two counts of felony murder, conspiracy to commit a violation of the Georgia Controlled Substances Act, aggravated assault, and two counts of possession

1. (a) Viewed in the light most favorable to the convictions, the evidence presented at Appellant's trial showed the following. On September 24, 2011, Tyrone Thomas drove Johnson and Terrance Denson to the townhouse where Ricardo Linton lived with his mother. Thomas testified that he could tell by "the way everything was going" and the phone calls that were coming in that Johnson and Denson were going to buy drugs. According to Linton, Johnson had contacted him through a third party to buy two pounds of marijuana for about $8,600. Linton called Appellant to supply the marijuana for the deal, which Appellant brought to Linton's house that afternoon in a white Volvo. Linton said the buyers arrived in a green Cadillac.

---

of a firearm during the commission of a felony. Appellant was tried alone from December 9 to 19, 2013. Linton testified for the State under a grant of testimonial immunity. The jury found Appellant not guilty of the drug conspiracy charge and the felony murder and firearm possession charges based on that offense, but guilty of the remaining three charges. The trial court merged the aggravated assault count into the felony murder conviction and sentenced Appellant to serve life in prison for felony murder and five consecutive years for the firearm conviction. Appellant filed a timely motion for new trial, which he later amended with new counsel. After an evidentiary hearing, the trial court denied the motion on June 21, 2018, and Appellant filed a timely notice of appeal. The case was docketed to the term of this Court beginning in December 2018, and we heard oral arguments on April 16, 2019.

While Appellant and Linton waited for the buyers, Appellant cocked a handgun and hid it under a pillow in his lap. When Linton asked why he had a gun, Appellant said, "you never know when somebody will try to rob you." After Johnson and Denson arrived at the house, Linton led them in through the garage to his bedroom, which was on the lower level. Johnson pulled out some cash, which did not appear to be the full $8,600; he would not let Linton count the money, and he asked to weigh the drugs. As Linton was leaving to get a scale, Denson pulled out a gun. Appellant lunged at him, and they struggled over the gun. Johnson, who was unarmed, pushed Linton to the floor, then went over to help Denson. Appellant kicked Denson off of him and fired two shots at Johnson, who was hit once in the shoulder and fell down. Appellant moved toward the bathroom while firing at Denson. Once Appellant made it to the bathroom, Denson fled the bedroom. [2]

---

[2] These details about the marijuana deal and what happened in Linton's bedroom came from Linton's final statement to the police and his trial testimony. Appellant did not testify, and Denson refused to testify even though he was granted testimonial immunity and was held in contempt.

Linton's mother, who was on the floor above his bedroom, heard a loud boom; heard Linton say, "leave my mom alone, leave my mom alone"; and then saw a man running up the stairs from Linton's bedroom with a gun. She told him to leave the house. After the man ran outside, she looked out the window and saw a "big green car" she did not recognize parked nearby. She also saw the man who had just left the house still outside, so she hid behind a wall. When she looked out again, the man and the car were gone. Thomas, who had been waiting outside in the car, heard two or three gunshots and then saw Denson run out of the house with a gun. Denson got in the car and yelled at Thomas to drive away.

Linton testified that after Denson left, Appellant, who had injured his finger in the struggle, was angry, saying, "I'm going to kill that motherf**ker." Appellant then gathered his belongings, including the marijuana. On his way out of the house, while still holding his gun, he looked at Linton in a threatening manner and told Linton to make the scene look like a burglary. After Appellant left, Linton called 911 and told the police that three men had tried

to rob him and two of them fled after the other one was shot. This was also the story Linton first told to police officers when they arrived. Several hours later, he changed his story, admitting that Appellant had been there. He also admitted that he planned a "deal" with Johnson, but claimed that the deal was not supposed to take place at his house and that Johnson and Denson surprised him there to rob him. Linton was arrested, and several weeks later, he gave the police another statement, which was consistent with his testimony about the planned drug deal at his house. Once he admitted Appellant was present during the shooting, Linton was consistent in characterizing Appellant as a "hero" who saved him and his mother.

Johnson died at Linton's house. He had been shot in the back left shoulder at close range, with the bullet traveling slightly downward from back to front, transecting his aorta. When the police searched Linton's bedroom, they smelled the strong odor of unburnt marijuana but found only a small amount of marijuana in little baggies. They also found three cartridge casings and two bullets, all

of which had been fired from the same gun as the bullet that killed Johnson.

In Linton's cell phone contacts, the police found phone numbers for "Ne-Yo Barbershop." Linton first told the police that these were numbers for a barbershop, but he later said that they were numbers for Appellant, whom Linton called "N.O." One of those numbers called Linton 15 times shortly after Linton called 911. The police determined that cell phones associated with that number and with another of the "Ne-Yo Barbershop" numbers, which the police independently connected to Appellant, were in the area of Linton's house around the time of the shooting.

After Appellant and Linton were arrested, they were put together in a holding cell while waiting for preliminary hearings. Appellant told Linton that he had burned the clothes he wore during the shooting, that the gun was gone, and that he painted the white Volvo black, so if Linton kept his mouth shut, they would be "in the clear." When Appellant returned from his hearing, however, he told Linton, "I'm going to f**king kill you." About a year later, a black

Volvo that was registered to the mother of Appellant's child was found; records indicated that the car was originally white. In addition, a Lexus connected to Appellant was located and searched shortly after his arrest. In the car, the police found $1,878 and a vacuum sealer with a small amount of marijuana in it; an expert in drug dealing testified that such machines are often used to seal large packages of illegal drugs. When Appellant called the mother of his child from jail and she told him that the police had taken the Lexus, he sounded upset. In another phone call from jail, this one to his girlfriend, Appellant said, "I know I f\*\*ked up. It's all messed up."[3] Prison medical records showed that 31 days after the shooting, Appellant was treated for a finger injury that he said he had suffered one month prior.

(b) Appellant argues that the weight of the evidence presented at his trial does not support his convictions and that he should

---

[3] The State also played a jail call made by Linton to his mother and sister in which they were talking about who had been arrested for the shooting and Linton said that "N.O." needed to "face the music."

therefore be granted a new trial based on the so-called "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21.[4] Whether to grant a new trial under either of these statutes is a decision directed solely to the discretion of the trial court. See *Dent v. State*, 303 Ga. 110, 114 (810 SE2d 527) (2018). When an appellant asks this Court to review a trial court's denial of a new trial on these grounds, we review the case under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), meaning that we consider only whether the evidence, viewed in the light most favorable to the convictions, was sufficient to support them. See *Dent*, 303 Ga. at 114.

Applying that standard, we conclude that the evidence presented at trial and summarized above was sufficient for a rational jury to find Appellant guilty beyond a reasonable doubt of

---

[4] OCGA § 5-5-20 says, "In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury." OCGA § 5-5-21 says, "The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

the crimes of which he was convicted. The evidence was clearly sufficient to prove that Appellant fatally shot Johnson, and although there was some evidence that he shot at Johnson to defend himself and Linton, the jury was entitled to give greater weight to the evidence that Appellant had a gun cocked and ready before the meeting with Denson and Johnson, while Johnson was unarmed. The jury could also consider Appellant's incriminating conduct after the shooting, including telling Linton to make the scene look like a burglary, threatening Linton, disposing of his gun and clothes, repainting his Volvo, and acknowledging to his girlfriend that he "f\*\*ked up." See *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019) ("[T]he jury . . . is free to reject a defendant's claim that he acted in self-defense." (citation and punctuation omitted)); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

There was also evidence that Appellant was engaged in a felony drug deal at the time of the shooting, which would preclude

his self-defense claim, as the jury was properly instructed. See OCGA § 16-3-21 (b) (2) ("A person is not justified in using force [in defense of self or others] if he . . . [i]s attempting to commit, committing, or fleeing after the commission or attempted commission of a felony[.]"); *Smith v. State*, 290 Ga. 768, 772 (723 SE2d 915) (2012).[5] This enumeration is therefore meritless.

2. Appellant argues that his trial counsel was ineffective in withdrawing requests for jury instructions on mutual combat and voluntary manslaughter as lesser offenses of felony murder. Counsel initially requested those instructions, but after consulting with Appellant, he decided to withdraw them. In closing argument, counsel focused on highlighting weaknesses in the State's case, in particular the unreliability of Linton as a witness. In discussing Linton's changing stories, counsel also pointed out that Linton called

---

[5] The fact that the jury acquitted Appellant of the drug-related crimes does not alter our analysis of the evidence supporting the convictions. See *Virger v. State*, 305 Ga. 281, 290 n.5 (824 SE2d 346) (2019) ("[I]nconsistent verdicts may simply reflect the jury's leniency or compromise. They do not undermine the legal validity of guilty verdicts for which there was sufficient evidence for a rational jury to find guilt beyond a reasonable doubt." (citations omitted)).

Appellant a "hero."

To succeed on his ineffective assistance claim, Appellant must show that his trial counsel's performance was professionally deficient and that the deficiency likely affected the outcome of the trial; this Court need not "'address both components of the inquiry if the [appellant] makes an insufficient showing on one.'" *Goodson v. State*, 305 Ga. 246, 249 (824 SE2d 371) (2019) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 697 (104 SCt 2052, 80 LE2d 674) (1984)). "Deciding which jury instructions to request is a matter of trial strategy," and to prove that counsel was deficient, Appellant must show that this strategy was patently unreasonable. Id. at 250.

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]

OCGA § 16-5-2 (a). The defense of mutual combat requires the mutual willingness, readiness, and intent of both parties to fight. See *Ruffin v. State*, 296 Ga. 262, 264 (765 SE2d 913) (2014). A

finding that a defendant was engaged in mutual combat when the victim was killed may authorize the jury to find the defendant guilty of voluntary manslaughter rather than murder. See *Berrian v. State*, 297 Ga. 740, 742 (778 SE2d 165) (2015).

Appellant does not point to any evidence of voluntary manslaughter or mutual combat. Instead, Appellant focuses on Linton's statements that Appellant was a "hero" who saved lives. But that testimony supported an instruction on defense of self or others — which trial counsel requested and the trial court gave the jury — not an instruction on mutual combat or voluntary manslaughter. See *Berrian*, 297 Ga. at 743 ("'[F]ighting to repel an unprovoked attack[ ] is self-defense, and is authorized by the law, and should not be confused with mutual combat.'" (citation omitted)); *Ruffin*, 296 Ga. at 264 (explaining that evidence that the defendant acted in self-defense does not support an instruction on voluntary manslaughter based on mutual combat). Because there was no evidence supporting mutual combat or voluntary manslaughter instructions, trial counsel was not ineffective in

declining to pursue them. See *Jeffrey v. State*, 296 Ga. 713, 716 (770 SE2d 585) (2015).

3. Appellant next contends that the trial court erred in two ways when the jury indicated that it was deadlocked — first by failing to grant a mistrial, and second by giving a coercive *Allen* charge.[6] Neither of these claims has merit.

(a) The jury heard about five days of evidence. After closing arguments, the trial court instructed the jurors, including the following charge:

> One of your first duties in the jury room will be to select one of your number to act as foreperson who will preside over your deliberations and who will sign the verdict form to which all 12 of you freely and voluntarily agree. You should start your deliberations with an open mind. Consult with one another and consider each other's views. Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors. Do not hesitate to change an opinion if you are convinced that it is wrong. However, you should never surrender an honest opinion in order to be congenial or to reach a verdict solely because of the opinions of the other jurors.

---

[6] See *Allen v. United States*, 164 U.S. 492, 501 (17 SCt 154, 41 LE 528) (1896).

At the end of the instructions, the jury was released for the day.

The next morning, the jury began its deliberations. After about four-and-a-half hours, it sent a note to the court asking what would happen if it failed to reach a unanimous verdict. The court instructed the jury to keep deliberating. About two hours later, the jury sent a note that said, "We have 2 jurors that do not agree with the other 10 and state that there is nothing they have seen or nothing we say — we can say that will change their mind." The court again told the jury to keep deliberating. Six minutes later, around 4:30 p.m., the jury asked to be released for the day. The court and parties agreed that adjourning for the day would be appropriate, and the jury was sent home. After about five hours of deliberation the following day, the jury sent another note, which said: "We are hopelessly deadlocked, even worse than yesterday. I, for one, have no idea how to resolve the extensive differences. We have not agreed to any count." Appellant then moved for a mistrial.

The trial court denied the mistrial motion and gave the following *Allen* charge:

You have now been deliberating upon this case for a considerable period of time, and the Court deems it proper to advise you further in regard to the desirability of agreement, if possible. The case has been exhaustively and carefully tried by both sides and has been submitted to you for a decision and verdict, if possible, and not for disagreement. It is the law that a unanimous verdict is required. While this verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is nevertheless necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with a proper regard for and deference to the opinion of each other. A proper regard for the judgment of others will greatly aid us in forming our own judgment.

Each juror should listen to the arguments of the other jurors with a disposition to be convinced by them. If the members of the jury differ in their view of the evidence, the difference of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion.

Your duty is to decide the issues that have been submitted to you if you can conscientiously do so. In conferring, you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for taking up and maintaining, in a spirit of controversy, either side of the cause. You should bear in mind at all times as jurors you should not be advocates for either side. You should keep in mind the truth as it appears from the evidence, examined in the light of the instruction of the Court.

You may again retire to the jury room for a reasonable time and examine your differences in a spirit of fairness and candor and try to arrive at a verdict.

Appellant did not object to this instruction.

The jury then resumed deliberating. After three more hours that day and another four-and-a-half hours the next day — during which the jury sent one note asking for clarification of the definition of felony murder but did not indicate that it was deadlocked again — the jury returned a verdict finding Appellant guilty of three of the charges and not guilty of the other three.

(b) Appellant contends that the trial court erred by denying the mistrial motion he made when the jury announced that it was deadlocked. The determination of whether a jury is hopelessly deadlocked is a "'sensitive' one 'best made by the trial court that has observed the trial and the jury,'" and the court's decision as to whether a mistrial is required on that ground is reviewed on appeal only for an abuse of discretion. *Smith v. State*, 302 Ga. 717, 718 (808 SE2d 661) (2017) (citation omitted). The jury in this case heard about five days of evidence and then deliberated for only about six hours before indicating that it had two hold-out jurors. The jury's next note, sent after five more hours of deliberation, indicated that

the jurors were deadlocked and that the juror who authored the note did not know how to resolve their differences. After they were given the *Allen* charge, however, they deliberated an additional seven-and-a-half hours without any indication of an impasse before finding Appellant guilty of some crimes and not guilty of others, indicating that they had not been as stuck as they believed. Under these circumstances, the trial court did not abuse its discretion in denying Appellant's motion for a mistrial. See id. at 721. See also *Humphreys v. State*, 287 Ga. 63, 80 (694 SE2d 316) (2010), disapproved on other grounds by *Willis v. State,* 304 Ga. 686, 706 n.3 (820 SE2d 640) (2018).

(c) Appellant also argues that the *Allen* charge was coercive because it did not specifically remind the jurors not to abandon their own conscientious beliefs. Appellant, however, did not request this reminder language at trial; in fact, he did not raise any objection to the content of the *Allen* charge. Accordingly, we review this contention only for plain error. See *Scott v. State*, 290 Ga. 883, 888 (725 SE2d 305) (2012).

Under this standard, we must determine whether there is an error that has not been affirmatively waived, the legal error is clear and obvious, the error affects the defendant's substantial rights, and the error "seriously affects the fairness, integrity or public reputation" of the judicial proceedings.

*Gamble v. State*, 291 Ga. 581, 583 (731 SE2d 758) (2012) (citation omitted).

The *Allen* charge given by the trial court in this case was essentially the same as the pattern instruction. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.70.70 Jury (Hung) (updated January 2019). The same instruction was given in *Drayton v. State*, 297 Ga. 743, 747 (778 SE2d 179) (2015), where we held that the trial court did not coerce the jury's verdicts based on the content of the *Allen* charge, the jury instructions as a whole, and the relevant circumstances, including the amount of time the jury deliberated and the guilty and not guilty verdicts returned. See id. at 748-749.

In *Drayton*, we pointed out that the full *Allen* charge and the jury instructions as a whole made it clear to the jurors that they were not required to reach agreement:

> [T]he supplemental instruction referred . . . to "the desirability of agreement, *if possible*" and told the jury that the case had been submitted to them "for a decision and verdict, *if possible*"; said . . . that "this verdict must be the conclusion of each juror and *not a mere acquiescence of the jurors in order to reach an agreement*"; and concluded by informing the jury that it was being sent back to the jury room to deliberate for only "a reasonable time . . . to *try* to arrive at a verdict." In addition, the court told the jurors before they started deliberating that while a verdict required the agreement of all 12 of them, they all had to "freely and voluntarily agree" to it, "[e]ach of you decide this case for yourself," and "you should never surrender an honest opinion in order to be congenial or to reach a verdict solely because of the opinions of the other jurors."

*Drayton*, 297 Ga. at 749 (emphasis in original). And although Appellant now complains that the trial court failed to remind the jurors not to abandon their conscientious beliefs, the court told them to decide the issues "*if you can conscientiously* do so." Furthermore, as discussed above, the overall circumstances of the jury's deliberations do not indicate that it was coerced. Accordingly,

Appellant has failed to demonstrate error, let alone plain error. See id. at 747. See also *Gamble*, 291 Ga. at 584 (holding that the appellant failed to demonstrate clear legal error in part "[b]ecause the trial court did not err in giving the pattern [*Allen*] charge to the jury").[7]

4. At the beginning of voir dire, the trial court announced that there were 55 prospective jurors on the venire panel and that 33 of them would be qualified for potential selection. At the end of voir dire, Appellant raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986), asserting that the State had improperly used five of its nine peremptory strikes (or about 56%) against African-American women. The trial court then asked about the racial and gender composition of the venire panel and the

---

[7] At oral argument before this Court, Appellant's counsel suggested that trial counsel provided Appellant ineffective assistance by failing to object to the content of the *Allen* charge. Appellant did not, however, raise this ineffective assistance claim in his motion for new trial or in his brief to this Court, so it is not properly presented. See *Clay v. State*, 290 Ga. 822, 829 n.2 (725 SE2d 260) (2012). In any event, the claim is meritless because, as discussed above, the *Allen* charge was not erroneous, so "any objection by counsel would have been futile." *Anglin v. State*, 302 Ga. 333, 343-344 (806 SE2d 573) (2017).

jury that had been selected. After some confusion, the attorneys and the court seemed to agree that there were eight qualified African-American women on the panel and that the State struck five of them.[8] There were four African-Americans on the jury; it is not clear from the record how many of them were women. Based on this information, the trial court ruled that Appellant had not made a prima facie case under *Batson*.

Appellant enumerates that ruling as error. We review the trial court's ruling on this issue only for an abuse of discretion. See *Brown v. State*, 291 Ga. 887, 889 (734 SE2d 41) (2012).

> [W]hen one party objects that another has unconstitutionally discriminated on the basis of race in its use of peremptory strikes, the objecting party bears the burden of making out a prima facie case of purposeful discrimination. To make out a prima facie case, the objecting party must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." It is not enough for the objecting party to note that prospective jurors of a certain race were struck by the other party. In addition, the objecting party must show that there are good reasons to think that those prospective jurors were [struck] "on account of their race."

---

[8] On appeal, Appellant asserts that there were nine African-American women on the venire panel. He may be counting a woman who was not qualified.

Id. (citations and emphasis omitted). In considering all relevant circumstances, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 96-97. See also *J.E.B. v. Alabama*, 511 U.S. 127, 129 (114 SCt 1419, 128 LE2d 89) (1994) (extending *Batson* to peremptory strikes based on the gender of the prospective juror).

Appellant argues that the State's use of the majority of its peremptory strikes against African-American women shows discriminatory intent, particularly because African-American women made up a small percentage of the venire.[9] We have held in

---

[9] The State asserts that although Appellant could challenge the State's use of peremptory strikes based on race or based on gender, he cannot combine the two categories. Neither the State nor Appellant cites any cases addressing this issue. The United States Supreme Court has not decided the issue, and federal and state courts have reached different conclusions on it. See *United States v. Walker*, 490 F3d 1282, 1292 n.10 (11th Cir. 2007) (declining to decide whether combined race-gender groups are cognizable under *Batson* after explaining that the United States Supreme Court has not yet decided the issue, state courts are divided on the issue, and the issue is in flux in federal circuit courts). See also Leah M. Provost, Excavating from the Inside: Race, Gender, and Peremptory Challenges, 45 Val. U.L. Rev. 307, 330-340 (2010) (discussing the various approaches used by state and federal courts addressing this issue).

some cases that a prima facie case was established solely by the percentage of strikes used against a certain cognizable group of prospective jurors — but in all of those cases the percentage of strikes used against the group was much greater than 56%. See, e.g., *Rakestrau v. State*, 278 Ga. 872, 874-875 (608 SE2d 216) (2005) ("[A]ll of the jurors struck by the State were African-American."); *Berry v. State*, 262 Ga. 614, 614-615 (422 SE2d 861) (1992) (explaining that the State used "nine out of ten peremptory challenges to strike black jurors"); *Weems v. State*, 262 Ga. 101, 102 (416 SE2d 84) (1992) ("The state exercised all ten of its peremptory strikes against black jurors."). Similarly, in cases where this Court has held that a prima facie case was established based on the

It appears that this Court has not yet decided the issue, and we decline to do so today, because Appellant's argument fails even assuming the combined basis for his *Batson* challenge is valid.

As for Appellant's argument that African-American women were a small percentage of the venire, it is not clear if the relevant number for comparing the eight qualified African-American women would be the 33 qualified prospective jurors (which would mean that African-American women were about 24% of the venire) or the 55 total prospective jurors (which would mean that African-American women were about 15% of the venire). Either way, the State struck five out of eight (or about 63%) of the African-American women in the venire.

percentage of strikes used compared to the overall venire, the State used all or almost all of its strikes to remove all or almost all of a particular cognizable group. See, e.g., *Smith v. State*, 263 Ga. 224, 226 (430 SE2d 579) (1993) ("[T]he State disproportionately employed 100 percent of its peremptory strikes against the black prospective jurors who comprised only 33 percent of the array."); *Ford v. State*, 262 Ga. 558, 559 (423 SE2d 245) (1992) ("The prosecutor . . . exercised 90 percent of his strikes to strike 90 percent of the blacks from the venire, while exercising 10 percent of his strikes to exclude a mere 3 percent of the whites on the venire."); *Gamble v. State*, 257 Ga. 325, 326 (357 SE2d 792) (1987) ("[T]he prosecutor here exercised all of his peremptory challenges against all of the black prospective jurors on the qualified venire." (citation, punctuation and emphasis omitted)).

Appellant has not identified any case, nor have we found one, that persuades us that a trial court must find a prima facie case of

discrimination in the circumstances presented here.[10] Accordingly, the trial court did not abuse its discretion in holding that Appellant failed to make out a prima facie case of purposeful discrimination. See *Brown*, 291 Ga. at 890 (holding that the defendant did not establish a prima facie case based on the State's use of four of its nine allotted peremptory strikes against black potential jurors); *Whitaker v. State*, 269 Ga. 462, 464 (499 SE2d 888) (1998) (holding that the defendant did not establish a prima facie case of gender or race discrimination based on the State's use of three strikes to eliminate white females, three to eliminate white males, and three to eliminate African-American females).

5. Finally, Appellant argues that the trial court erred by admitting into evidence at trial, over his objection, audio recordings of two of the jail phone calls. We see no reversible error.

---

[10] The only case Appellant cites that involved a strike percentage close to the one here is a Court of Appeals decision affirming the trial court's ruling that the defendant *failed* to make a prima facie case. See *Horton v. State*, 234 Ga. App. 478, 481 (507 SE2d 221) (1998) ("Horton's sole evidence was that the State used 33 percent of its strikes to remove members of his race from the 34 person venire which contained 18 percent of his race.").

(a) One recorded jail call was made by Appellant to his girlfriend, during which he said, "I know I f\*\*ked up. It's all messed up." Appellant objected to this evidence on the ground that it was "extremely prejudicial." See OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). "Rule 403 is an extraordinary remedy, which should be used only sparingly." *Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) (citation and punctuation omitted).[11]

Although Appellant's statement may have cast him in a prejudicial light, it was not an *unfairly* prejudicial light, and the evidence was probative because it indicated that after the shooting Appellant believed he had done something wrong. Accordingly, the trial court did not abuse its discretion in admitting this call. See

---

[11] Appellant did not raise a hearsay objection, but he also argues that his statement was not an "admission." As the State points out, his statement qualifies as an admission by a party-opponent. See OCGA § 24-8-801 (d) (2) (A) ("Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is . . . [t]he party's own statement . . . .").

*Anglin*, 302 Ga. at 337 ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; 'it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion.'" (citation and emphasis omitted)).

(b) The other recording was of a call that Linton made to his mother, in which he said that Appellant needed to "face the music." We need not decide whether this statement was erroneously admitted, because any error was harmless. See *Bozzie v. State*, 302 Ga. 704, 708 (808 SE2d 671) (2017) ("For nonconstitutional harmless error, the State has the burden to show that it was highly probable that the error did not contribute to the verdict."). It is highly probable that this generalized statement made by Linton would not have led the jurors to find Appellant guilty if they otherwise disbelieved Linton's account of Appellant as the shooter. See *Puckett v. State*, 303 Ga. 719, 722 (814 SE2d 726) (2018) (holding that there was no harm from the admission of testimony as a prior consistent statement when it was largely cumulative of other admitted evidence).

*Judgment affirmed. All the Justices concur.*

Decided June 24, 2019.

Murder. Gwinnett Superior Court. Before Judge Batchelor.

*Bruce S. Harvey*, for appellant.

*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Samuel R. d'Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.