**FIFTH DIVISION**
**REESE, P. J.,**
**MARKLE and COLVIN, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**Please refer to the Supreme Court of Georgia Judicial**
**Emergency Order of March 14, 2020 for further**
**information at (https://www.gaappeals.us/rules).**

**May 21, 2020**

# In the Court of Appeals of Georgia

A20A0402. HUGHLEY v. THE STATE.

COLVIN, Judge.

After a jury trial, Deanthony Hughley was convicted of two counts of armed robbery, two counts of aggravated assault, and one count of possession of a firearm during the commission of a felony. He appeals from the denial of his motion for new trial, arguing that the trial court erred by denying his *Batson* motion and by failing to grant his motion for mistrial for improper injection of evidence into closing argument. He also argues that his trial counsel rendered ineffective assistance of counsel by failing to file a speedy trial demand. For the following reasons, we affirm.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." (Citation omitted.) *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165)

(2004). We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the record shows that on November 7, 2012, Keith Holley drove his girlfriend Moya Thompson's home and parked outside of her house. Holley and Thompson chatted in the car for about 30 minutes. While chatting, they noticed several men walk past them. Thompson recognized one of the men as Hughley and commented that "I know him from high school." Moments later, Hughley returned and knocked on the drivers' side window with a gun. Two men wore masks and stood guard on either side of the car, holding guns "like how a solider would hold a gun." Hughley told Holley to open the car door, and he did as instructed. Hughley then pointed the gun at Moya and Thompson and demanded their money and phones. Thompson handed their money and phones to Hughley. When Hughley demanded "give me everything," Thompson handed him her purse. Hughley then instructed the couple to "put your head down, put your head down, don't look at me." They complied initially, but when Thompson raised her head, Hughley turned and fired

2

several shots in her direction. One of the bullets hit Holley's car, and another entered Thompson's house and went through the bathroom wall.

Holley drove Thompson to a nearby gas station to call for help. Thompson called her mother, who instructed her to go back to the house, lock all doors and wait for her to come home. Once back inside the house, Thompson and Holley called 911. When officers arrived, Thompson identified Hughley as the gunman and showed officers his profile on Facebook. She identified another picture of Hughley as the gunman to the interviewing detective.

At trial, Hughley admitted that he was present at the scene of the crime and fired shots in Thompson's direction. However, he claimed that he was simply on his way home when he noticed "three boys all on one side of a car," and that he fired shots at the true perpetrators after he startled them by asking for a lighter. Hughley explained that he was carrying his handgun with him that day because there is "a lot of stuff that goes on around that area when you out late – late at night. And plus, you hear gunshots every other night, so that's why I always keep my personal handgun on me."

Hughley was charged with and a jury found him guilty of two counts of armed robbery, two counts of aggravated assault and one count of possession of a firearm by a convicted felon. His motion for new trial was denied.

1. Although Hughley has not challenged the sufficiency of the evidence against him, we reviewed the record and conclude that the evidence outlined above was sufficient to sustain his conviction. See OCGA § 16-8-41 (defining armed robbery); 16-5-21 (defining aggravated assault); 16-11-106 (defining possession of a firearm during the commission of a felony).

2. Hughley argues that the trial court erred in overruling his challenge under *Batson v. Kentucky*, 476 U. S. 79 (106 S.Ct. 1712, 90 LE2d 69) (1986), asserting that the State had improperly used two of its peremptory strikes against the only two African-American males on the venire panel. We find no error.

There were 47 prospective jurors on the venire panel, and 32 of them would be qualified for potential selection. At the end of voir dire, Hughley raised a challenge pursuant to *Batson,* asserting that Juror Number 6 and Juror Number 24, both African-American men, had been improperly struck. The trial court then asked about the racial and gender composition of the venire panel and the jury that had been selected. The attorneys and the trial court seemed to agree that there were five

4

qualified African-Americans on the panel and that the State struck two of them. The State argued that there were three African-Americans in the jury pool that the State had accepted, but that Hughley had struck. One African-American woman was empaneled on the jury. Based on this information, the trial court ruled that Hughley had not made a prima facie case under *Batson*.

> When one party objects that another has unconstitutionally discriminated on the basis of race in its use of peremptory strikes, the objecting party bears the burden of making out a prima facie case of purposeful discrimination. To make out a prima facie case, the objecting party must show that the totality of the relevant facts gives rise to an inference of discriminatory purpose. It is not enough for the objecting party to note that prospective jurors of a certain race were struck by the other party. In addition, the objecting party must show that there are good reasons to think that those prospective jurors were struck on account of their race. In considering all relevant circumstances, a pattern of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.

(Citation and punctuation omitted.) *Bannister v. State*, 306 Ga. 289, 298 (4) (830 SE2d 79) (2019). In *J. E. B. v. Alabama*, 511 U. S. 127 (114 SCt 1419, 128 LE2d 89) (1994), the United States Supreme Court extended its holding in *Batson*, supra, to instances where peremptory strikes are exercised solely on the basis of gender, and

5

the "three-part test utilized to review claims of race discrimination under *Batson* is also applied to analyze gender discrimination claims." (Citation omitted.) *Shell v. State*, 264 Ga. App. 547, 547 (1) (591 SE2d 450) (2003). Accord *Tedder v. State*, 265 Ga. 900 (463 SE2d 697) (1995). We review a trial court's factual findings on such a motion "with great deference and [they] may be disregarded only if clearly erroneous." (Citations omitted.) *Hightower v. State*, 220 Ga. App. 165, 166 (1) (469 SE2d 295) (1996).

Hughley argues that the trial court erred in this ruling because his *Batson* challenge was not to the strikes of African-American jurors in general, but the striking of all available African-American males from the jury pool. Hughley has cited to no United States Supreme Court nor Georgia precedent ruling that the protections of *Batson* extend to combined race-gender groups.[1] However, in a similar case, the Eleventh Circuit has declined to recognize a race-gender group as a "cognizable racial group." See *U. S. v. Dennis*, 804 F.2d 1208 (11th Cir. 1986).

---

[1] Although the appellant in *Bannister,* supra, argued that the trial court erred in denying his *Batson* challenge on the grounds that the State struck five of the eight available African-American women on the venire panel, our Supreme Court did not render a decision as to whether a gender-race class constituted a "certain cognizable group of prospective jurors." *Bannister*, 306 Ga. at 298-300 (4).

As an initial matter, the relevant cognizable racial group, for the purposes of our analysis, is the group of blacks generally and not just black males, as [Hughley] urge[s]. The test we apply to determine whether [the struck jurors] are members of a cognizable racial group under *Batson*, is the test applied in *Castaneda v. Partida*, 430 U. S. 482 (97 S.Ct. 1272, 51 LE2d 498), cited in *Batson*[.] Such a group is "one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda*, [supra]. The group of blacks generally clearly qualifies under this definition; [Hughley has] failed to show, however, that black males constitute a distinct, recognizable subclass of individuals who have been singled out for different treatment under the laws not simply as blacks, but as black males. It would therefore be inappropriate for us to narrow the "cognizable racial group," . . . to include only black males and exclude black females.

Id. at 1210 (VII).

Here, the State used only two of its peremptory challenges during the selection of the twelve jurors who decided the case to strike African-American men. Hughley also used two of his peremptory challenges to strike African-Americans that had been accepted by the State. It is "obvious that the [State] did not attempt to exclude all blacks, or as many blacks as it could, from the jury." *Dennis*, supra. Because Hughley

7

failed to make out a prima facie case of purposeful discrimination under *Batson*, supra, the trial court did not err in denying his *Batson* challenge.

3. Hughley argues that the trial court erred by failing to grant a mistrial or to rebuke the prosecution and give corrective instructions to the jury after he objected to the State's closing argument on the grounds that it injected prejudicial matters not in evidence. We find no error.

During its closing argument, the State told the jury

Officer Hartman came and he testified. He said he . . . canvassed the area. And he said he talked to some of the neighbors. And the neighbors said they heard gunshots, but they didn't come out or they didn't investigate. Why? Because — it's not unusual for people to live with the blast of gunshots surrounding them, with DeAnthony Hughley and his posse roaming the street, never leaving home without their masks and guns, like it's an AmEx card. Think of not only the fear they've instilled on the victims of this incident but the neighbors. They just lock themselves in their home. . . .

Defense counsel then objected to this statement "as being improper character evidence" and moved for a mistrial. The trial court overruled the objection without comment. Hughley now argues that the trial court erred in denying its motion because the State injected prejudicial matters not in evidence during closing argument.

8

Specifically, he objects to the State's references to Hughley's "posse" that "roamed the street," that he never left the house without his mask and guns and that the neighbors lived in fear.

The only objection Hughley raised below, however, was not the same one he now asserts on appeal in his enumeration of error and brief. At trial, Hughley objected to the closing argument on the grounds that it introduced improper character evidence. On appeal, Hughley now argues that the trial court erred by injecting prejudicial matters not in evidence during closing argument. "Therefore, he has waived all issues of admissibility to which he failed to pose a timely, specific objection at trial, and we will not consider an argument raised for the first time on appeal." *Hunter v. State*, 273 Ga. App. 52, 54 (2) (614 SE2d 179) (2005).

Even if this enumeration were properly before us, moreover, it is without merit. "A prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion. Within that wide latitude, a prosecutor may comment upon and draw deductions from the evidence presented to the jury." (Citations and punctuation omitted.) *Booth v. State*, 301 Ga. 678, 688 (4) (804 SE2d 104) (2017). Further, "it is appropriate . . . for the prosecutor to urge the jury to convict the defendant for the safety of the community or to curb an epidemic of

9

violence in the community[.]" *Faust v. State*, 302 Ga. 211, 220 (4) (c) (805 SE2d 826) (2017). Here, the objected-to evidence was rooted in the evidence at trial. Office Hartman testified that residents in the area had told him that they did not come out of their houses after hearing gunshots and that it was common to hear gunshots in the area. Hughley testified that "I always keep my personal handgun on me[,]" and Thompson testified that Hughley was accompanied by masked individuals that night. "While [Hughley] objects to the statements made by the [S]tate as improperly characterizing the evidence, the statements did not introduce new facts but merely commented on the evidence presented to the jury, and they do not require granting [Hughley] a new trial." (Punctuation and footnote omitted.) *Whatley v. State*, 296 Ga. App. 72, 76 (3) (637 SE2d 510) (2009).

4. Hughley claims that he was denied effective assistance of counsel when his trial counsel failed to file an out-of-time statutory speedy trial demand after the trial court granted him permission to do so. For the following reasons, we find no reversible error.

When reviewing the trial court's denial of appellant's claim that the delay in trying his case constituted ineffective assistance of counsel, "we apply an analysis based on [*Strickland v. Washington*, 466 U. S. 668 (104 S.Ct. 2052, 80 LE2d 674)

10

(1984)] – that is, whether appellant demonstrated *both* deficient performance and that he suffered prejudice as a result of such alleged deficiency." (Citations omitted; emphasis supplied.) *Jones v. State*, 296 Ga. 561, 569 (6) (769 SE2d 307) (2015).

Under OCGA § 17-7-171, "[a]ny person accused of a capital offense may enter a demand for a speedy trial at the term of court at which the indictment is found or at the next succeeding regular term thereafter; or, by special permission of the court, the defendant may at any subsequent term thereafter demand a speedy trial." OCGA § 17–7-171 (a). See also *Crawford v. State*, 252 Ga. App. 722, 723 (1) (556 SE2d 888) (2001) ("Although armed robbery is not a capital offense punishable by death, OCGA § 17-7-171 is the statute that applies to that offense") (citation omitted). Thereafter, "[i]f more than two regular terms of court are convened and adjourned after the term at which the demand for speedy trial is filed and the defendant is not given a trial, then the defendant shall be absolutely discharged and acquitted of the offense charged in the indictment," so long as (1) juries were impaneled and qualified to try the defendant during both terms and (2) the defendant was "present in court announcing ready for trial and requesting a trial on the indictment." OCGA § 17-7-171 (b). In *Walker v. State*, 290 Ga. 696 (723 SE2d 894) (2012), our Supreme Court held that "*more than two* regular terms of court" means just that – a number of regular court

11

terms greater than two." Id. at 698 (2). Therefore, "under the plain language of OCGA § 17-7-171 (b), a defendant accused of a capital offense may be discharged and acquitted only if [he] is not given a trial after at least three full terms of court have expired since the term in which [his] demand was filed." Id. The terms of court for Fulton County begin on the "First Monday in January, March, May, July, September and November." OCGA § 15-6-3 (3).[2]

On April 22, 2013, Hughley's trial counsel requested permission to file an out-of-time demand for speedy trial. The trial court addressed the motion in a hearing on May 1, 2013. Defense counsel asked to file an out-of-time speedy demand or that the trial court try the case at the next available calendar in June. The trial court orally granted Hughley's motion to file an out-of-time demand for a speedy trial and noted that, once it was filed, the case would need to be tried by the end of October based on its mistaken belief that the May/June term of court in Fulton County began on May 1, 2013.[3] When it asked defense counsel if this was correct, defense counsel agreed.

---

[2] OCGA § 15-6-3 has since been amended several times since 2013, but the terms of court applicable to Fulton County have not changed. See Laws 2009, Act 210, §1, effective January 1, 2010.

[3] May 1, 2013, was a Wednesday, and so the motion to file an out-of-time demand for speedy trial was filed in the March term of court. See OCGA § 15-6-3 (3).

The trial court entered an order granting the motion the same day. However, trial counsel did not file a demand pursuant to this order. See OCGA § 17-7-171 ("A demand for trial filed pursuant to this Code section shall be filed as a separate, distinct, and individual document"); *Smith v. State*, 261 Ga. 298, 299 (2) (404 SE2d 115) (1991) ("While a trial court can grant a defendant special permission to file an out-of-time demand for speedy trial, a trial court cannot actually make that demand for defendants").

Because the trial court's order granting Hughley's motion for an out-of-time speedy trial demand was filed on Wednesday, May 1, 2013, it was filed in the March/April 2013 term of court. See OCGA § 15-6-3 (3) (the May/June 2013 term of court did not commence until the first Monday in May). If Hughley's trial counsel had filed the speedy trial demand on May 1, 2013, in accordance with OCGA § 17-7-171, the trial court would have had until the first Monday in November (November 4, 2013), to commence his case. Hughley was not tried until November 12, 2013.

Even assuming Hughley's trial counsel rendered deficient performance, Hughley has not shown that he was prejudiced by his trial counsel's alleged error in failing to file a demand for speedy trial. To show the prejudice component of the

13

*Strickland* test, a defendant must show a reasonable probability that the outcome of the case would have been different. *Smith v. State*, __ Ga. __ (3) (839 SE2d 630) (2020). Hughley argues that his case would have been discharged because it was tried after the applicable term of court expired. However, Hughley cannot prove whether he would have been tried earlier if his trial counsel had properly filed a speedy trial demand. During the May 1, 2013, hearing, the trial court agreed to expedite Hughley's trial and put it on the "front-burner." However, when the speedy trial demand was not filed, the trial court may have reasonably concluded that Hughley abandoned his intent to file a speedy trial demand and adjusted its trial calendar accordingly. This is especially true when trial counsel testified at the motion for new trial that he very rarely filed speedy trial demands because they were not always beneficial to defendants, that he did not think it would have been helpful for Hughley, and that he did so only at Hughley's request. Compare *Crawford v. State*, 278 Ga. 517, 519 (603 SE2d 259) (2004) (defendant was entitled to habeas relief because his trial counsel was ineffective by failing to comply with the strict requirements of OCGA § 17-7-171 when its speedy trial demand cited to the wrong statute and that defendant was thereby prejudiced, and further holding that defendant was also

14

prejudiced by appellate counsel's failure to raise ineffective assistance of counsel claim on appeal).

*Judgment affirmed. Reese, P. J., and Markle, J., concur*.