310 Ga. 579
FINAL COPY

S20A1187.  THOMAS v. THE STATE.

WARREN, Justice.

Travis Bernard Thomas, Jr., was convicted of malice murder and other crimes in connection with the shooting deaths of Jabrial Adams and Kenny Hart.[1]  On appeal, Thomas contends that the evidence was insufficient to sustain his convictions and that the trial court erred in denying his motion for mistrial, admitting evidence of a confession, and admitting testimony regarding pre-trial

---

[1] The crimes were committed in the early morning hours of March 2, 2017.  On May 16, 2017, a Houston County grand jury indicted Thomas for two counts of malice murder, two counts of felony murder, two counts of aggravated assault, and two counts of possession of a firearm during the commission of a felony.  At a trial held from October 23 to 25, 2018, a jury found Thomas guilty of all counts.  On November 2, 2018, the trial court imposed concurrent sentences of life in prison without the possibility of parole for the malice murder counts, plus five years in prison for each weapons offense, to run consecutively to the sentences for malice murder and concurrently with each other.  The two felony murder counts were vacated by operation of law, and the trial court merged the two counts of aggravated assault into the malice murder counts.  Thomas timely filed a motion for a new trial, which he amended on October 16, 2019.  The trial court denied the amended motion on January 3, 2020, and Thomas timely filed a notice of appeal on January 16, 2020.  The case was docketed in this Court to the August 2020 term and submitted for a decision on the briefs.

identifications of Thomas.  Seeing no error, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Thomas's trial showed that he wore an electronic ankle monitor.  Records from the monitor demonstrate that he left his house at 11:16 p.m. on March 1, 2017, and then reentered the house at 1:26 a.m. on March 2, 2017.  During that interval, Thomas was seen by two witnesses at the "Jus One More" club in Warner Robins.  Adams and Hart, who were brothers, and their cousin, Deontae Hart, were also present at the club.  Deontae had known Thomas for approximately three years prior to the night of the shooting.

While Thomas was at the club, a fight involving Adams, Hart, and Aldridge Davis broke out.  During the fight, two to three gunshots were heard, followed by a pause, and then more gunshots. Adams was shot first, and Hart was shot while running away. Deontae and Brittny Walker, another witness, each testified at trial and identified Thomas as the shooter.  After returning to his house at 1:26 a.m., Thomas's ankle monitor showed that he left again at

2

2:58 a.m. and did not return until 10:40 a.m., and that it had been tampered with and removed during that time. About two weeks after the shootings, Thomas was located in South Carolina and arrested.

On the night of the shootings, Sergeant Shane Mann was called to Jus One More at approximately 2:00 a.m. He obtained security recordings from the bar that showed a man "pistol whipping" another man before firing shots toward him. Sergeant Mann then compiled photographic lineups that Detective Justin Clark later showed to Brittny and Deontae separately. Both Brittny and Deontae identified Thomas from one lineup as the shooter and Davis from another as being involved in the fight that preceded the shooting.

About a week after the shootings, Taylor Turner, who identified herself as a good friend of Thomas, overheard Davis and Thomas talking about some men who tried to fight Davis. During the conversation, either Davis or Thomas said, "They got what they deserved." Turner testified that Thomas told her he cut his leg

3

monitor off to go see his ailing mother in South Carolina.

While Thomas was in the Houston County jail, he shared a pod with Dasmine Walker, who was not related to Brittny. Dasmine wrote three letters from the jail to the prosecutor's office regarding Thomas's involvement in the Jus One More shooting. Dasmine testified that he did not seek a deal to testify nor did the district attorney's office offer him a deal. He then testified that Thomas admitted he shot "Little Kenny and Jabrial or something like that"; told Dasmine there was a video that showed Thomas run away but did not show his face; and said, "No face, no case." Dasmine also testified that Thomas said he cut off his ankle monitor and went to North Carolina or South Carolina after the shooting.

Thomas argues that the evidence—which he characterizes as "vague and ambiguous and conflicting at best"—was insufficient "but for" the confession and the pre-trial identifications that he contends were improperly admitted. Our sufficiency review, however, "considers all evidence, whether admissible or not." *Thomas v. State*, 308 Ga. 26, 28 (838 SE2d 801) (2020). Thomas does

4

not argue that the evidence admitted by the trial court, including his confession and the eyewitness identifications, was insufficient to support his convictions. Id. Nevertheless, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Thomas guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Thomas contends that the trial court erred in denying his motion for mistrial after a courtroom spectator was permitted to testify in front of the jury. Thomas, however, failed to preserve this issue for appellate review.

During Thomas's trial, the State informed the trial court and defense counsel that deputies had reported that Toni Staggers, who had no connection to Thomas but had apparently driven one of the defense witnesses to court and had been sitting behind the defense table in the courtroom, had been going in and out of the room where witnesses were sequestered. At a sidebar conference, the State

5

asked to examine Staggers in front of the jury. The trial court allowed the State to question Staggers outside the jury's presence and then, over defense counsel's objection, in front of the jury. Her testimony was similar both times: she had been seated behind the defense table and had gone into the witness room after every witness finished testifying, but had not told any of the witnesses about the testimony. However, Corporal Andrew Gunn, who provided security for the courthouse, testified that he saw Staggers enter and exit the courtroom and that he saw Staggers in the witness room facing one of the witnesses and heard her say, "That's not what she said at that time."

After Corporal Gunn was cross-examined, the evidence was closed, the jury was excused for the day, and the State requested a jury charge on violation of the rule of sequestration. Thomas's counsel objected to any instruction, arguing that there was no evidence that Thomas had anything to do with what Staggers said, and moved for a mistrial on the sole basis of Staggers's testimony. The trial court denied the motion and ultimately decided not to give

6

the requested charge. Defense counsel later renewed his motion for mistrial, arguing generally that Thomas had been prejudiced. The trial court denied the motion on the basis that Staggers's testimony was necessary for the jury to determine whether she influenced or collaborated with defense witnesses.

"A motion for mistrial must be promptly made as soon as the party is aware of the matter giving rise to the motion." *De La Cruz v. State*, 303 Ga. 24, 29 (810 SE2d 84) (2018) (citation and punctuation omitted). "[I]f the defendant did not make a contemporaneous motion for a mistrial at the time the defendant became aware of the matter giving rise to the motion, then the defendant has waived review of this issue on appeal." *Coley v. State*, 305 Ga. 658, 661 (827 SE2d 241) (2019) (citation and punctuation omitted). Here, instead of moving for a mistrial when Staggers testified, Thomas cross-examined Staggers and waited until another witness testified and the evidence was closed, the jury was excused for the day, and the State requested a charge on violation of the rule of sequestration before moving for a mistrial. Because Thomas's

motion for mistrial was "not made contemporaneous with the testimony that he complained about, the issue of whether the court abused its discretion in denying [his] later motion for mistrial is not properly before this Court for review. . . . This enumeration of error therefore fails." Id. at 662 (defendant waived appellate review of his mistrial motion where he did not move for mistrial until after the witness completed his testimony without further objection or motion, another witness testified, and a recess was taken for lunch).

3. Thomas contends that the trial court erroneously admitted Dasmine's testimony that Thomas confessed to shooting Hart and Adams. We conclude, however, that the trial court did not abuse its discretion in determining that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice.

Thomas objected to Dasmine's testimony on the ground that "its probative value is far outweighed by its inherent prejudice," arguing that no party asked Dasmine to testify; rather, he asked to be allowed to testify. The State proffered that Dasmine had written letters to the district attorney with information about the case, that

Dasmine was interviewed, and that he gave more details than the police had publicized. After noting that the State did not plant an inmate in Thomas's cell in an attempt to procure a confession, the trial court ruled that the probative value of Dasmine's testimony was "not substantially outweighed by any unfair prejudice." Thomas argues that Dasmine's testimony was unfairly prejudicial because it did not include certain information, such as what type of gun was used, whether Thomas went to North Carolina or South Carolina after the shooting, and other facts that were not included in news stories; because of evidence that Dasmine had an altercation with two of Thomas's friends; and because of the general unreliability and bias of jailhouse informants.

Thomas's objection at trial was based on OCGA § 24-4-403 ("Rule 403"). See *Bannister v. State,* 306 Ga. 289, 300 (830 SE2d 79) (2019) (where an objection that a statement by the defendant was "extremely prejudicial" was analyzed under Rule 403, even though the defendant did not specifically cite the rule). Under Rule 403, "[r]elevant evidence may be excluded if its probative value is

9

substantially outweighed by the danger of unfair prejudice. . . ." We have explained that "[t]here is no mechanical solution for this balancing test," and that in each case, a trial court must undertake "a considered evaluation of the proffered justification for the admission of such evidence and make an independent determination of whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *State v. Orr*, 305 Ga. 729, 737 (827 SE2d 892) (2019) (citation and punctuation omitted). "In reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Favors v. State*, 305 Ga. 366, 368 (825 SE2d 164) (2019) (citation and punctuation omitted). "Decisions regarding relevance are committed to the sound discretion of the trial court, and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Mitchell v. State*, 307 Ga. 855, 864 (838 SE2d 847) (2020) (citation and punctuation omitted).

Although Thomas's appellate argument is couched in terms of

unfair prejudice, he primarily focuses on minimizing the probative value of Dasmine's testimony. But the circumstances on which Thomas relies—including the absence of certain details and Dasmine's altercation with Thomas's friends—do not undermine the probative value of his confession. Instead, they concern witness credibility—but Dasmine's credibility, which is a question exclusively for the jury, was indeed properly placed before the jury through his direct and cross-examination at trial. See *Mattei v. State*, 307 Ga. 300, 302 (835 SE2d 623) (2019) (The defendant "attack[ed] [the jailhouse informant]'s testimony regarding his confession as 'uncorroborated and unreliable.' But, issues of witness credibility are for the jury to decide."). And Thomas's general attack on the testimony of jailhouse informants as a class of evidence is not itself a reason to exclude Dasmine's testimony. See *Orr*, 305 Ga. at 737 (Rule 403 "provides no authority for an appellate court to direct the exclusion of entire categories of evidence."). Dasmine's testimony about Thomas's confession—whether credible or not— was undoubtedly probative. See *Arizona v. Fulminante*, 499 U.S.

11

279, 296 (111 SCt 1246, 113 LE2d 302) (1991) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.") (citation and punctuation omitted); *Smith v. State*, 302 Ga. 717, 724 (808 SE2d 661) (2017) ("Certainly, the relevance of defendant's own statements about the crime cannot be disputed.") (citation and punctuation omitted). And although this evidence was inherently prejudicial— as all confessions are—nothing suggests that it was *unfairly* prejudicial. See *Smith*, 302 Ga. at 724 ("[T]he question before us is not whether the [defendant's] telephone call . . . was prejudicial, but rather whether the danger of unfair prejudice substantially outweighed the probative value of the [evidence]."); *Anglin v. State*, 302 Ga. 333, 337 (306 SE2d 573) (2017) ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion.") (citation and punctuation omitted; emphasis in original). Thus, the trial court did not abuse its discretion in admitting the confession. See, e.g., *Edwards v. State*, 308 Ga. 176,

183 (839 SE2d 599) (2020) (trial court did not abuse its discretion under Rule 403 in admitting defendant's inculpatory phone call because it was highly probative and not unfairly prejudicial); *Bannister*, 306 Ga. at 300.

4. Thomas contends that the trial court erred by failing to exclude testimony regarding pre-trial photographic identifications of Thomas on the ground that the lineups were impermissibly suggestive. Because Thomas has not shown that the lineups were impermissibly suggestive, this enumeration also fails.

After Adams's and Hart's murders, Sergeant Mann prepared an array of six photographs, including a photograph of Thomas, to show two eyewitnesses, Brittny and Deontae. At trial, Sergeant Mann testified that, in compiling the lineup, he looked for photographs of people who were the same race and sex as the suspect and who had other similar characteristics such as age, hairstyle, and facial hair. The same photographic compilation was shown to both Brittny and Deontae, but with the photographs in a different order. Under police department policy, an officer who did

13

not prepare the array presented the lineups to the eyewitnesses. That officer told each eyewitness that the appearance of the people in the photographs might now be different if, for example, their weight, hairstyle, or facial hair had changed, and he asked each witness to pay attention to facial features. He used a computer program to show the lineup; the program displayed a statement that the suspect may or may not be included in the lineup. Before trial, Thomas moved to suppress Deontae's and Brittny's identifications of Thomas from the photographic lineups on the basis that they were impermissibly suggestive and gave rise to a substantial likelihood of misidentification. The trial court denied Thomas's motion, ruling that there was no undue suggestion or inappropriate procedure in the making of the lineups or the manner in which the photographs were selected. On appeal, Thomas argues only that the lineups were impermissibly suggestive because his photograph was "distinct visually" in the lineup due to "different lighting" that "basically

14

highlighted" Thomas's photograph.[2]

"If an out-of-court identification by a witness is so impermissibly suggestive that it could result in a substantial likelihood of misidentification, evidence of that out-of-court identification violates due process and is inadmissible at trial." *Westbrook v. State*, 308 Ga. 92, 99 (839 SE2d 620) (2020) (citation and punctuation omitted). "This Court employs a two-step process in examining a trial court's admission of identification evidence for error." *Bowen v. State*, 299 Ga. 875, 879 (792 SE2d 691) (2016). First, "[w]e review a trial court's determination that a lineup was not impermissibly suggestive for an abuse of discretion." *Westbrook*, 308 Ga. at 99. "[A]n identification procedure is not impermissibly suggestive unless it leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is the equivalent of the authorities telling the witness, 'This is our

---

[2] In his appellate brief, Thomas concedes that there was not a problem with police "follow[ing] their own department procedure" with respect to the photographic lineup—only with the "nature of the photos themselves." See *Newton v. State*, 308 Ga. 863, 867 n.4 (843 SE2d 857) (2020).

15

suspect.'" Id. (citation and punctuation omitted). Second, if a trial court properly "concludes that the State employed an impermissibly suggestive pre-trial identification procedure, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification." *Curry v. State*, 305 Ga. 73, 76 (823 SE2d 758) (2019) (citation and punctuation omitted). If, however, a trial court properly determines that "the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." *Westbrook*, 308 Ga. at 99 (citation and punctuation omitted).

Here, the record reveals that the six photographs contained in each of the two photographic lineups at issue are substantially similar. Moreover, although Thomas complains that his photograph has "different lighting" than others, the record shows that at least one of the other photographs in each array has lighting similar to Thomas's photograph. Thomas has thus failed to show "that the lineup[s] led [the eyewitnesses] to the virtually inevitable

16

identification of [Thomas] as the perpetrator; it was not the equivalent of the authorities telling [the witnesses], 'This is our suspect.'" *Westbrook*, 308 Ga. at 100 (citation and punctuation omitted). See also *Redding v. State*, 296 Ga. 471, 474 (769 SE2d 67) (2015) ("[S]light differences in the size, shading, or clarity of photographs used in an identification lineup will not render the lineup impermissibly suggestive.") (citation and punctuation omitted); *Green v. State*, 291 Ga. 287, 293 (728 SE2d 668) (2012) ("[W]e conclude that the differences that Appellant has pointed out are indeed slight, that his photograph is not the only one in each array with as much clarity, and that Appellant has failed to show how the differences would render either array unduly suggestive."). Accordingly, because the trial court was authorized to conclude that the photographic lineups were not impermissibly suggestive, it did not abuse its discretion by denying Thomas's motion to suppress the identification testimony. See *Westbrook*, 308 Ga. at 100; *Green*, 291 Ga. at 293. As a result, "it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification,"

*Westbrook*, 308 Ga. at 99 (citation and punctuation omitted), and Thomas's enumeration fails.

*Judgment affirmed.  Melton, C. J., Nahmias, P. J., and Boggs, Peterson, Bethel, Ellington, and McMillian, JJ., concur.*

DECIDED DECEMBER 21, 2020.
Murder. Houston Superior Court. Before Judge Adams.
*Jonathan P. Waters*, for appellant.
*George H. Hartwig III, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.