**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 20, 2024

S24A1083. EDWARDS-TUGGLE v. THE STATE.

ELLINGTON, Justice.

A Gwinnett County jury found Sean C. Edwards-Tuggle ("the appellant") guilty of felony murder and aggravated assault in connection with the shooting death of his stepfather, Christopher Grier.[1] The appellant argues that his conviction should be reversed because the trial court gave a coercive jury instruction, defense counsel was ineffective for failing to object to the admission of certain evidence or to move for a mistrial, and the cumulative effect

---

[1] On July 11, 2018, a Gwinnett County grand jury indicted the appellant for malice murder, felony murder, and aggravated assault in connection with Grier's death. Following a trial that ended on November 18, 2022, the jury found the appellant guilty of felony murder and aggravated assault but acquitted him of malice murder. The court sentenced the appellant to life in prison for felony murder and merged the aggravated assault count into the felony murder count. The appellant filed a motion for a new trial on December 9, 2022, and new counsel amended it on September 15, 2023. Following a hearing held on September 21, 2023, the trial court denied the motion for a new trial on February 5, 2024. The appellant filed a notice of appeal on March 3, 2024. The case was docketed in this Court to the August 2024 term and submitted for a decision on the briefs.

of those two errors prejudiced his defense, warranting a new trial. As explained below, the appellant has not carried his burden of showing any error that requires reversal. Therefore, we affirm the trial court's order denying the appellant's motion for a new trial.

The evidence admitted at trial shows the following. The appellant shot and killed Grier on April 1, 2018, during an Easter Sunday cook-out at the family's Gwinnett County home. At the time of the shooting, the appellant and his half-sister, Camryn Grier ("Camryn"), as well as their mother, Charnique Edwards ("Edwards"), lived in the same home with Grier. The appellant, who was 27 years old at the time, had moved back into the family home a few months prior to the shooting. Camryn, who described the family dynamic as "dysfunctional," testified that her parents argued frequently and that Grier was verbally abusive to her mother and the appellant.

Shortly before the shooting, Grier, Edwards, Camryn, the appellant, and the appellant's eight-year-old daughter, S. T., had gathered at the family home. The appellant and Camryn were in

2

their rooms. Edwards and S. T. were in the kitchen and Grier was in the backyard, grilling chicken. While the food was cooking, Grier and Edwards began arguing. Grier cursed at Edwards and started calling her and the appellant vulgar names.

During the argument, the appellant emerged from his room adjacent to the kitchen and went to the garage, where his car was parked. When he came back into the kitchen, he had a pistol in his hand. S. T., who was standing by a door that opened from the kitchen into the back yard, testified that the appellant pointed his gun at Grier as Grier returned from the grill. Edwards testified that, as Grier walked across the patio toward the kitchen door, the appellant pointed his gun at Grier and said: "Say something now, mother f**ker."  Edwards testified that the appellant "had an evil look in his eyes."  The appellant then shot Grier twice in the chest, and Grier collapsed to the ground. Edwards and S. T. both testified that Grier had nothing in his hands when the appellant shot him.

Camryn testified that, while she was upstairs in her room, she heard her mother shout: "Don't do that. Sean, don't do that." Then

she heard two gunshots. Camryn ran downstairs to the kitchen. She saw Grier lying on the ground just outside the kitchen door. The appellant was nearby, holding a gun. When Camryn asked the appellant why he had shot her father, he responded: "Get out of my face." The appellant left the house and did not return. S. T. called 911 while Camryn and Edwards tried to help Grier. Camryn testified that she saw nothing in her father's hands or on the ground around him that could be used as a weapon.

The police who responded to the scene saw nothing that could be used as a weapon on or near Grier's body. The police recovered two .40 caliber casings from the residence. The medical examiner testified that two .40 caliber projectiles pierced Grier's chest, causing massive heart and lung injuries that were not survivable. He ruled the manner of Grier's death a homicide.

Two days after the shooting, the appellant, who had fled to New York, approached a transit officer at a train station in Brooklyn. He told the officer that he wanted to turn himself in because he had done something "really, really bad." The transit officer testified that

4

the appellant told her that he had shot his stepfather during an argument and wanted to turn himself in. After detaining the appellant, the New York authorities searched his backpack and found an unfired bullet but no gun.

The appellant testified in his defense at trial. He said that he was awakened from a nap by the argument between his mother and Grier. When he emerged from his bedroom, he had some of his belongings, including his gun, in his hands. The appellant testified that Grier approached him with a large grill fork in his hand, verbally abused him, and then stabbed him in the chest with the fork. He claimed that he shot Grier in self-defense. He testified that he got treatment for his wound in New York, but the defense offered no corroborating evidence of the claimed injury.

On behalf of the defense, a clinical social worker testified that the appellant shot Grier while suffering from "battered person syndrome." The appellant also presented several lay witnesses, including his mother, who testified that Grier had repeatedly verbally and physically abused the appellant since 2003, shortly

5

after Grier had married his mother. In rebuttal, the State offered the testimony of a psychiatrist who opined that the appellant – who was an adult at the time of the crime and was physically and financially capable of leaving the family home – had "an absence of behavior or psychiatric illness that would be consistent with battered person syndrome." For example, the appellant showed no signs of remorse or "learned helplessness;" moreover, he was sometimes the aggressor in family disputes. The psychiatrist testified that the appellant had "a great deal of dislike" for Grier and that it was possible the shooting had been motivated by revenge.

1. The appellant contends that the trial court erred in giving the jury an instruction concerning the time available for deliberations, which he characterizes as "unduly coercive," and that the trial court should have granted a mistrial after defense counsel objected to the instruction. For the following reasons, we disagree.

The trial transcript shows that, following the charge of the court and just before the jury retired to deliberate, the judge told the jurors the following:

Folks, as I told you, submitting an important case to both sides at 4:10 on a Friday afternoon before a holiday week is not ideal, but it's still an important case to both sides. My experience is that jury deliberations take a while. That's why we have 12 people. They see it differently. So the intent is to get it right, not go fast. Ordinarily, we would keep you until you reach a verdict. That may or may not be possible today. And then that creates another problem because it's my understanding that there's at least some jurors that may not be available on Monday. See, most of the time I just have you come back the next day. We can no longer open the courtroom on [the weekend] – the building is so huge, there's no way to get the infrastructure in to make it work anymore. There may come a time, if you deliberate into the evening, that you want something to eat. In that regard there, the county authorizes us – how is it we word it? They authorize us to get food from Papa Johns in Lawrenceville.

. . . .

My point in mentioning that to you is on a Friday, when I have to order food for jurors, it really takes about an hour to an hour and 15 minutes to get it here. So if you decide you want me or you need me to order food for you, build that into your request.

After the jury left the courtroom, defense counsel moved for a mistrial, arguing that the court's instruction suggested that the jury should expedite their deliberations and reach a verdict that evening. The judge responded that the jury could return on Monday, so long as they had sufficient jurors available that day. Although one juror might be out of town, the judge explained, they still had an

alternate. The judge then told counsel: "So my intent is I want to keep them [until] they get a verdict. I have never given a capital case to a jury at 4:10 in the afternoon and had them reach a verdict that night. It's never happened." The jury, however, returned its verdict that night at 10:56 p.m.

The appellant argued that the court's instructions coerced the jurors into disregarding their obligations as jurors in favor of reaching a verdict quickly. Relying in part on cases involving the propriety of *Allen*[2] charges, the appellant argued that the court's instructions were a form of "verdict urging" involving a "time fuse" charge, one that implied a deadline for returning a verdict. The State, on the other hand, contended that the court's instructions did not urge the jury to reach a verdict quickly; rather, they were merely administrative guidance concerning scheduling matters. As

---

[2] See *Allen v. United States*, 164 U.S. 492 (17 SCt 154, 41 LE 528) (1896). "The central inquiry in reviewing an *Allen* charge is whether the instruction is coercive so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." *Scott v. State*, 290 Ga. 883, 888 (6) (725 SE2d 305) (2012). In this case, the jury had not yet begun to deliberate. The circumstances did not involve a dead-locked jury or one that had been deliberating for an unusually long period of time.

explained below, we agree with the State.[3]

Viewed in context, the trial judge's remarks about scheduling the jury's deliberations were simply ordinary efforts to manage the business of a trial. Over the course of the trial, the judge kept the jury informed about various expected delays and breaks in the proceedings due to unrelated court matters, Veterans Day, and Thanksgiving. The judge told the jury at one point: "I'll try to keep things going, you know, keep us on track. . . . We're not in the go-fast business; we're in the get-it-right business."   On the evening of the day before the case went to the jury, the judge informed the jury that deliberations might be continued into the following week. The judge noted: "Sometimes juries deliberate for days. Sometimes they deliberate [for] a short time. There's no prediction. I just don't want there to be any exigency tied to your time. That's all I try to avoid, so that you can give things your undivided attention."

---

[3] Moreover, even if a claim that a trial judge encouraged a jury to move deliberations along (outside the *Allen*-charge context and without anything more) is the kind of jury-coercion claim that could in theory warrant a mistrial (a point that we do not decide today), we conclude that the appellant has not shown that any such claim prevails here.

With respect to such administrative or trial management instructions, "a broad discretion is vested in the judge below, and that that discretion will not be controlled by this court unless it is manifestly abused." *Watkins v. State*, 278 Ga. 414, 415 (603 SE2d 222) (2004) (citation and punctuation omitted). The judge's discretion in controlling the conduct of a trial necessarily includes the power to determine the length of time the jury will be allowed to deliberate on a given day. See also *Emerson v. State*, 315 Ga. App. 105, 112 (2) (726 SE2d 600) (2012) (The trial court did not abuse its discretion in instructing the jurors that they would have to arrange for childcare during the course of deliberations if the deliberations extended past regular working hours. The charge merely set out the trial court's time schedule for conducting deliberations so that the jury could plan ahead.); *Simpkins v. State*, 149 Ga. App. 763, 768 (4), 769 (256 SE2d 63) (1979) (The trial court did not abuse its discretion in retaining the jury in deliberations from 6:30 p.m. until 4 a.m. the following morning.). See also OCGA § 15-1-3 (4) ("Every court has power . . . [t]o control, in the furtherance of justice, the conduct of its

10

officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto[.]").

Given the circumstances of this case, the trial court's remarks about submitting the case on a Friday afternoon, ordering dinner, and possibly continuing into the following week cannot be understood as urging the jury to reach a verdict quickly or setting a deadline for returning a verdict. Rather, the court's statements constituted administrative guidance for the jury concerning how long they would likely be deliberating that evening and in the coming days, guidance that clearly fell within the wide discretion afforded trial judges in managing their courtrooms. Consequently, the appellant has shown no abuse of discretion in the trial court's ruling denying the appellant's motion for a mistrial on this ground. See, e.g., *Watkins*, 278 Ga. at 415; *Emerson v. State*, 315 Ga. App. at 112 (2); *Simpkins v. State*, 149 Ga. App. at 768 (4).

2. The appellant asserts that he was denied constitutionally effective assistance of counsel when his attorney failed to object to questions posed by the prosecutor on cross-examination that elicited

improper evidence of the appellant's bad character, in violation of OCGA § 24-4-404 (a) and (b). He argues that his convictions must be reversed because trial counsel's deficient performance resulted in the admission of unfairly prejudicial evidence. In addition, the appellant argues that trial counsel should have moved for a mistrial. For the following reasons, we disagree.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was professionally deficient and that such deficient performance resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 695 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (3) (689 SE2d 280) (2010). To prove deficient performance, the appellant must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013); see also *Strickland*, 466 U. S. at 687-688 (III). To prove prejudice, the appellant must establish a reasonable probability that, in the absence of counsel's deficient performance,

12

the result of the trial would have been different. *Strickland*, 466 U.S. at 695 (III) (B). If the appellant fails to establish either the "deficient performance" or the "prejudice" prong of the *Strickland* test, this Court is not required to examine the other prong. See *Green v. State*, 291 Ga. 579, 580 (2) (731 SE2d 359) (2012).

The trial transcript shows that the prosecutor questioned the appellant about his troubled relationship with S. T.'s mother, Melissa Glasper, and that the appellant admitted that he and Glasper had argued. When asked if he had ever struck Glasper, the appellant denied that he had. When the prosecutor asked if he had been arrested for striking her, the appellant replied: "No. I got arrested for when she cheated on me. And we were cheating on each other." When asked again, the appellant admitted that he had been arrested for family violence. At that point, the trial court stopped the cross-examination and excused the jury from the courtroom.

Outside the presence of the jury, the court asked the prosecutor why evidence of the appellant's arrest was admissible. The prosecutor explained that she was attempting to rebut the

appellant's portrait of himself "as the victim of violence by all of these people." The prosecutor acknowledged, however, that she had not asked to admit the evidence under OCGA § 24-4-404 (b). When the court questioned defense counsel about his lack of an objection to this testimony, counsel explained that he assumed the prosecutor was going to follow up as to why it was admissible. The trial court asked the parties to contemplate whether a mistrial was in order and took a five-minute recess. After the recess, the court concluded that the State had elicited improper character evidence and asked defense counsel what remedy he preferred. Defense counsel responded,

> I ask that you give a cautionary instruction to the jury to disregard what they heard. This is inappropriate evidence under the rules, whatever legal admonishment you want, but with all due respect, we've conferred, and my client wants to proceed with this jury. We will not request, your Honor, the mistrial.

With respect to his decision not to object, trial counsel added: "[W]e knew what we were doing, respectfully."

Upon the jury's return, the trial court gave the following

14

curative instruction:

> Ladies and gentlemen, there was an objection – actually, I specifically asked you to step out. There was no objection. It was on my own volition. I find that the State's inquiry concerning past arrest of the defendant to be improper. Has absolutely nothing to do with this trial, not in accordance with the evidence rules that we're all bound to follow. So I must instruct you to disregard it in its entirety. It has no bearing in this case.

The trial court asked trial counsel if he desired any additional instruction, and counsel responded that the court's instruction was satisfactory.

At the hearing on appellant's motion for a new trial, trial counsel explained that his decision not to object to evidence of the appellant's prior misdemeanor arrest for striking his girlfriend was a strategic decision. Counsel explained that he believed the evidence may have been admitted later pursuant to Rule 703 as something the State's expert had considered when evaluating the appellant's "battered person syndrome" defense. Moreover, counsel preferred having this incident before the jury because it would show that "the best they've got of him being aggressive is pushing a girlfriend."

15

Counsel said he was far more concerned about the serious matter of the appellant perpetrating a home invasion and aggravated assault with a firearm just twelve hours before the shooting, and counsel had successfully kept that out of evidence. Additionally, when asked why he wanted a curative instruction if he wanted the misdemeanor arrest in evidence, trial counsel explained that if he chose not to accept the court's offer for a curative instruction, he would draw attention to the matter and "educate the State" on his strategy. Trial counsel added: "We wanted this jury. We picked a good jury."

The appellant argues that trial counsel's strategy was not reasonable under the circumstances because evidence of the misdemeanor family violence convictions would not have been admissible under OCGA § 24-7-703.[4] However, assuming without deciding that trial counsel's strategy was unreasonable and that

---

[4] OCGA § 24-7-703 provides:
Such facts or data [reasonably relied upon by an expert] that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

16

counsel was deficient for failing to object to the evidence or to move for a mistrial, the admission of the evidence did not prejudice the appellant's defense. First, "the trial court's prompt curative instruction negated any prejudice by telling the jury to disregard the reference, an instruction that we presume the jury followed." *Lynn v. State*, 310 Ga. 608, 612 (3) (852 SE2d 843) (2020). Additionally, the challenged testimony was fleeting, with the jury only hearing that the appellant had been arrested – not convicted – for family violence and that the appellant had denied striking his girlfriend. See *Rashad v. State*, 318 Ga. 199, 210 (3) (b) (897 SE2d 760) (2024) (pretermitting whether a witness's reference to the defendant's prior time in jail violated Rule 404 (b), testimony was fleeting and undetailed and "likely had little prejudicial effect on the jury"). Moreover, no prejudice from the admission of this evidence has been shown given the other, compelling evidence of the appellant's guilt. In this case, the appellant's family members testified that the appellant shot Grier, who was unarmed, after hearing Grier verbally abuse the appellant and the appellant's mother. Other than the

17

appellant's own self-serving testimony, there was no evidence of a weapon or an injury to the appellant's body that would substantiate his claim of self-defense. Further, the appellant's "battered person syndrome" defense had been undermined by testimony from the State's expert, who opined that the appellant did not display behaviors consistent with the defense. The appellant also fled to New York where he admitted to a transit officer that he had "done something really, really bad" when he shot his stepfather. The appellant's own mother testified that the appellant looked "evil" during the shooting, and that Grier did not deserve to die over a mere argument. Given the overwhelming evidence of the appellant's guilt, there is no reasonable probability that the trial's outcome would have been different absent the admission of appellant's testimony. See *Clements v. State*, 317 Ga. 772, 798 (7) (c) (896 SE2d 549) (2023) ("Even if [the witness's] testimony was improper character evidence that should have been excluded under OCGA § 24-4-404 (a), the admission of this testimony did not prejudice [the] defense given the other compelling evidence detailed above[.]").

Further, because there was little if any prejudice from the admission of the evidence, particularly in light of the trial court's instructions, the appellant cannot show that the trial court would have abused its discretion in denying a motion for a mistrial under these circumstances, had the appellant made such a motion. See *Thrift v. State*, 310 Ga. 499, 503 (4) (852 SE2d 560) (2020) (The trial court did not abuse its discretion in denying a motion for a mistrial based on the admission of allegedly improper character evidence where the evidence had negligible impact on the outcome of the trial.).

Because the requisite prejudice has not been shown, the trial court properly found that the appellant failed to carry his burden under *Strickland* and, therefore, properly denied the motion for a new trial on ineffective assistance of counsel grounds. See *Green*, 291 Ga. at 580 (2).

3. The appellant argues that he is entitled to a new trial due to the cumulative prejudicial impact of the trial court's errors. A cumulative error analysis, however, requires an appellant to show that "at least two errors were committed in the course of the trial[.]"

*Flood v. State*, 311 Ga. 800, 808 (2) (d) (860 SE2d 731) (2021) (citation and punctuation omitted). Here, there is no basis for evaluating the cumulative effect of alleged errors because the appellant has not shown that at least two errors occurred. See id. at 808-809 (2) (d).

*Judgment affirmed. All the Justices concur.*