NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 3, 2026

S25A1088. WOODS v. THE STATE.

ELLINGTON, Justice.

Maleik Woods appeals his convictions for malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of Francisco Dwayne Zapata.[1] Woods asserts as his first claim of error on appeal that the trial court

---

[1] Zapata was shot and killed on November 5, 2018, and on January 15, 2019, a DeKalb County grand jury indicted Woods in connection with the shooting on charges of malice murder (Count 1); felony murder based on armed robbery (Count 2); felony murder based on aggravated assault (Count 3); armed robbery (Count 4); aggravated assault (Count 5); and possession of a firearm during the commission of a felony (Count 6). Following a jury trial in November 2019, the jury acquitted Woods on Counts 2 and 4, but found him guilty on the remaining counts. The trial court sentenced Woods to life in prison with the possibility of parole on Count 1 and five years to serve on Count 6, to run consecutively to Count 1. The remaining counts were either vacated or merged. Woods filed a timely motion for new trial, which was twice amended by new counsel, on January 4, 2021, and November 11, 2024. The trial court denied the motion on December 23, 2024, and Woods filed a timely notice of appeal. The case was docketed to the August 2025 term of this Court and submitted for a decision on the briefs.

abused its discretion in admitting, over objection, evidence of other acts pursuant to OCGA § 24-4-404(b). Woods also argues that the trial court committed plain error when it "coerced the deadlocked jurors into reaching a unanimous verdict." And Woods contends that the combined effect of these two errors requires that his convictions and sentences be reversed. Seeing no merit to these arguments, we affirm.

Zapata[2] and Woods were friends , and on November 5, 2018, the two were seen together several times at their mutual friend Isaac Summage's house in Gwinnett County. Summage testified that Woods was unemployed at the time and had been sleeping on Summage's couch the previous three nights. Zapata's girlfriend saw them there at around 11:30 a.m. when they were sitting in Zapata's burgundy Kia in Summage's driveway. The girlfriend noticed that Woods, who was sitting in the front passenger seat, was wearing

---

[2] Although the trial transcript identifies the victim in this case as "Francisco Simpata," the indictment, the trial court's order on the motion for new trial, and other record documents identify the victim as "Francisco Zapata," and we refer to him accordingly.

2

black pants and a yellow hoodie. While the two were at Summage's house that morning, Summage saw Zapata counting $1,500 in cash in Woods's presence. Zapata did not have a bank account and was known for carrying cash in his wallet. Zapata and Woods left Summage's house around noon in Zapata's Kia and returned around 4:00 or 5:00 p.m. They stayed for around one-half hour and left again but returned "for a brief moment" after Summage called Zapata and arranged "to get some weed."[3]    Zapata and Woods then left Summage's house together in Zapata's Kia about 7:00 p.m.

Sometime between 7:30 and 7:35 p.m. that evening, as Shakita White turned into the DeKalb County apartment complex where she lived, she noticed a burgundy Kia backed into a parking space, with two people inside. White testified that the person in the driver's seat looked like a white female, and the evidence at trial showed that Zapata had lighter-colored skin and "long hair, a little bit below his shoulder," which he always "wore back in like a messy bun."   White

---

[3] The evidence showed that in late 2018, Zapata, who was employed full-time, was earning extra money by selling marijuana.

3

said the person in the passenger seat was wearing a yellow hoodie.

That same evening, Steven Holland, another apartment complex resident, was sitting in his car in the complex parking lot, listening to music, when he "heard a pop" that "sounded like a gunshot." Holland went inside his apartment for a time and then returned to his car and drove toward the complex's exit. As Holland was driving toward the exit, he saw a car backed into a parking space with the driver's door open and what appeared to be a bag of clothes on the ground. However, when he drove by the car, Holland looked closer and saw that there was a body beside the car, with the legs still in the vehicle and the rest of the body on the ground. Holland then called 911, parked, and waited for police to arrive. The evidence showed that Holland's 911 call was placed at 7:58 p.m. on November 5, 2018, which Holland said was "[p]robably about 15 minutes" after he heard the "pop."

Sheila Nesbit, another resident of the complex, testified that she was inside her apartment when she heard a "loud noise" outside, followed about 30 seconds later by the same noise again. Nesbit went

4

outside on her deck to see where the noise was coming from, and about ten minutes later, she saw police lights coming into the complex. She then observed a police officer go to a car that was backed into a parking space. Nesbit said that about ten minutes before she heard the loud noise, she happened to look out her window and noticed that car in the parking lot. It stood out to her because it was not a car that usually parked there.

When the first police officer arrived on the scene, at 8:04 p.m., Holland was waiting in his vehicle and directed the officer to a burgundy Kia. The officer approached the vehicle and observed a person lying on the ground, with one leg still in the vehicle through the open driver's side door. The officer first reported that the victim was female, but upon closer inspection he realized the victim was male. The officer determined that the man had been shot, but the body was still warm, and the officer thought he detected a light pulse. He began performing chest compressions until emergency medical help arrived and moved the victim. When the lead detective arrived sometime later, emergency medical personnel were on the

scene and had determined that the man, later identified as Zapata, was dead.

Investigators later determined that the apartment complex was about a 26-minute to one-hour drive from Summage's house, depending on traffic. A subsequent analysis of cell phone records from Woods's phone showed that on the night of the shooting it was utilizing a cell tower located within approximately two miles of the apartment complex between 7:38 and 7:41 p.m. Officers also retrieved a photo from Woods's cell phone showing Woods in a yellow hoodie. A video retrieved from Summage's cell phone also showed Woods wearing a yellow hoodie.

Summage testified that Woods called him on Facetime around 1:00 a.m. the morning after the shooting, and the first words out of Woods's mouth were "I had to do it to him." Summage testified that he understood that Woods was referring to Zapata. And when Summage, also referring to Zapata, asked, "bro died, bro is dead?" Woods became "like frantic" and said, "bro, I swear to God, I didn't kill him." Then Woods told Summage he would call him back and

6

disconnected the call, but Woods never called Summage back or returned to Summage's house.

An autopsy revealed that Zapata died of a gunshot wound to the back consistent with a shot fired from a handgun. From a search of Zapata's Kia, investigators determined that the car was likely the main crime scene. Zapata's cell phone was inside the car, and officers found a single shell casing on the driver's side floorboard. Based on the location of the casing, investigators believed that it came from a semi-automatic handgun fired from inside the car. Investigators also discovered a wallet in the car, but no cash was found in the car or on Zapata's person. Zapata's Kia was impounded for further investigation. When the police later released the car to Zapata's stepfather, he turned on the car's engine and searched the dashboard display for the last phone connected to the car. The screen read: "Retro searching," and the evidence showed that Zapata and others referred to Woods by the nickname "Retro."

Vontaria Carlton testified at trial about an earlier incident involving Woods (hereinafter referred to as "the May 21 incident").

7

Carlton said that on May 21, 2018, she visited Lakaylah Walker at Walker's house. Walker and Woods had a child together, and Woods was at the house when Carlton arrived. As Carlton entered the house, Woods and Walker were arguing. When Woods started "to go towards" Walker, Walker told Woods to leave and that the police had been called. Walker's baby was in another room crying, and Carlton picked up the baby to try to calm her. At that point, Carlton also told Woods to leave, and he began cursing at Carlton. Woods then pulled out a gun and pointed it at Carlton while she was holding the baby. Carlton said that Woods eventually put the gun away and started physically fighting with Walker, pulling her hair, choking her, and hitting her before the police arrived.

1. Woods argues that evidence from the May 21 incident was improperly admitted for purposes of knowledge and intent pursuant to OCGA § 24-4-404(b) ("Rule 404(b)") and that he was harmed by the admission of the improper evidence.[4]

---

[4] Woods's enumeration of error on this issue includes language suggesting that he also is asserting a claim of ineffective assistance of trial

"We review a trial court's evidentiary rulings under an abuse of discretion standard of review." *Williams v. State*, 302 Ga. 474, 478 (2017) (quotation marks omitted). "And even where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a 'substantial right,' and thus harm, the defendant." *Venturino v. State*, 306 Ga. 391, 393 (2019); OCGA § 24-1-103(a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). Where, as in this case, the alleged error is non-

counsel based on counsel's failure to object to the prosecution's closing argument concerning this evidence. In addition, Woods asserts in his brief that the issue of ineffective assistance of counsel was preserved for appeal because it was raised at the first available opportunity. However, Woods does not otherwise address the issue of ineffective assistance of counsel in his appellate briefing. He asserts no specific argument regarding that issue, nor does he cite any legal authority addressing the issue's merits. We conclude, therefore, that to the extent that Woods attempts to assert a claim of ineffective assistance of counsel on appeal, he has failed to carry his burden to establish such a claim. See *Clark v. State*, 321 Ga. 732, 737 (2025) ("To prevail on a claim of ineffective assistance, an appellant bears the burden of showing both that trial counsel's performance was professionally deficient and that he was prejudiced as a result of that deficient performance." (citing *Strickland v. Washington*, 466 U.S. 668, 695 (1984)); *Clark v. State*, 307 Ga. 537, 543–44 (2019) (rejecting an ineffective-assistance-of-counsel claim where the appellant argued that comments were inadmissible but made "no argument, much less a sufficient showing, that the trial court erred in concluding that trial counsel's decision not to object was [not] objectively unreasonable").

constitutional, "we examine whether it is highly probable that the error did not contribute to the verdict by reviewing the record de novo and weighing the evidence as we would expect reasonable jurors to have done." *Pounds v. State*, 320 Ga. 288, 294 (2024) (cleaned up).

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." OCGA § 24-4-404(b). Such evidence, however, may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," if the evidence is relevant for proving that other purpose. Id. Where a trial court errs in admitting Rule 404(b) evidence, we generally have found such errors harmless "where the properly admitted evidence was so strong that the prejudicial effect of the other-acts evidence had no significant influence on the guilty verdicts." *Dickerson v. State*, ___ Ga. ___ (2026), S25A1365, slip op. at 11-12 (Ga. Jan. 21, 2026) (2026 WL 151134) (quotation marks omitted). See also

*Nundra v. State*, 316 Ga. 1, 6 (2023).

Additionally, this Court previously has stated that jury instructions limiting the use of 404(b) evidence can reduce the effect that such evidence might have on a jury's decision, where the evidence of guilt is strong. See, e.g., *Priester v. State*, 316 Ga. 133, 138–39 (2023) (concluding that any error in the admission of evidence that the appellant committed an armed robbery and shot at a car during a drug deal on the day before he committed the charged crimes was harmless, given that the trial court instructed the jury that it could not infer propensity from that evidence and that the other evidence of his guilt was strong); *Nundra*, 316 Ga. at 8 (determining that the trial court's "admonition that the jury may not infer from [the 404(b)] evidence that the accused is of a character that would commit such crimes reduce[d] the likelihood that the evidence of [the defendant's] past crimes influenced the verdict" (quotation marks omitted)); *Williams v. State*, 313 Ga. 443, 450 (2022) ("Because we ordinarily presume that jurors follow [the trial court's instructions], any unfair prejudice from the admission of the

[Rule 404(b)] evidence was reduced." (quotation marks omitted)).

Here, the State filed a pre-trial request to introduce evidence of the May 21 incident pursuant to Rule 404(b). At a later hearing on the issue, the State proffered the evidence for the purpose of showing intent and knowledge. The prosecutor explained that the State's theory of the case was that Woods shot Zapata while robbing him at gunpoint, noting that Woods had no job, he knew Zapata was carrying cash after seeing Zapata with $1,500 that day, and no money was found at the crime scene. The prosecutor argued that the State needed the evidence of the May 21 incident because investigators had not found the gun used in the shooting and the State wanted to show that just months earlier, Woods had pointed a gun at someone else he knew intimately. The next day, the trial court entered an order admitting the evidence for the purposes of knowledge and intent.

Before Carlton testified at trial, the trial court gave a limiting instruction on the use of the evidence regarding the May 21 incident and repeated that instruction in its general charge to the jury. Those

instructions directed the jurors to consider the Rule 404(b) evidence "only insofar as it may relate" to the issues of knowledge and intent that the State must prove in the crimes charged in the case on trial and that they "may not infer from such evidence that the defendant is of a character that would commit such crimes."

Even assuming, without deciding, that the trial court abused its discretion in admitting the evidence of the May 21 incident, we conclude that any such error was harmless. The State presented strong circumstantial evidence to support Woods's convictions. The evidence showed that Woods and Zapata spent much of November 5, 2018, together and that they left Summage's house together in Zapata's burgundy Kia around 7:00 p.m. White saw two people matching Zapata's and Woods's descriptions sitting in Zapata's burgundy Kia in the complex parking lot at around 7:30 to 7:35 p.m. The person whom White described as a white female fit Zapata's description, and the clothing worn by the person in the passenger seat matched that worn by Woods earlier that day. The dashboard display in Zapata's car indicated that Woods's cell phone appeared

13

to have been the last phone connected to the car's communication system, and Woods's cell phone data showed that Woods's cell phone was in the area of the complex between 7:38 and 7:41 p.m. Witness testimony placed the sound of a gunshot just minutes later, as Holland said he heard the shot approximately 15 minutes before he made the 911 call at 7:58 p.m., which would place the shot at around 7:43 p.m.

Additionally, evidence collected at the scene supported that the shot that killed Zapata was fired from inside the Kia, and Zapata's body was found shot in the back and hanging out of the driver's side door. Although Zapata had $1,500 earlier in the day and his wallet was found in the car, no cash was discovered at the crime scene. Hours after the shooting, Woods placed a video call to Summage in which Woods said that he "had to do it to him." Summage understood "him" to refer to Zapata, and Woods appeared "frantic" when Summage asked if Zapata were dead.

Moreover, the State did not mention the May 21 incident in opening statement and made, at most, only two brief references to

the evidence in closing, and we have stated that under such circumstances, the prejudicial effect of Rule 404(b) evidence may be minimized. See *Redding v. State*, 320 Ga. 107, 118 (2024). And the trial court twice instructed the jury that the evidence of the May 21 incident was being introduced for the limited purposes of knowledge and intent, and in each set of instructions, the court specifically directed the jurors that they could not use the evidence to determine that Woods had the character to commit the acts charged against him.

Accordingly, because the State presented strong, properly admitted evidence of Woods's guilt and the trial court provided limiting instructions on the use of the Rule 404(b) evidence, we conclude that it is highly probable that any error in admitting the evidence of the May 21 incident did not contribute to the jury's guilty verdicts. See *Dickerson*, slip op. at 13–14. See also *Nundra*, 316 Ga. at 8. Woods's claim of error on this ground fails.

2. Woods also contends that the trial court committed plain error "when it coerced the deadlocked jurors into reaching a

unanimous verdict."

Because Woods did not raise a timely objection to the trial court's instructions that he now asserts were "coercive," we review his claim only for plain error. See *Hill v. State*, 310 Ga. 180, 194 n.8 (2020); OCGA § 17-8-58(b). To prevail on plain-error review, an appellant must show that the trial court's alleged instructional error "was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Clark v. State*, 315 Ga. 423, 440 (2023) (quotation marks omitted). "If one prong of the plain error test is not satisfied, we need not address the other prongs of the test." *Baker v. State*, 319 Ga. 456, 462 (2024). Moreover, "[s]atisfying this high standard is difficult, as it should be." Id. (quotation marks omitted).

The jury in this case began deliberating on Thursday, November 7, 2019, at 1:57 p.m. Sometime later that afternoon, the jury sent a note asking to see two pieces of evidence. The jury was brought back into the courtroom where the trial court responded to

the jury's request, and the jurors resumed their deliberations at 4:29 p.m. Later, when the trial judge sent the deputy to ask the jurors when they wanted to break for the evening, the jury replied with a note that read, "We're not able to come to a unanimous decision." The trial court brought the jury back into the courtroom, and, without directly responding to the note, released the jurors for the day at around 6:02 p.m. Woods's counsel raised no objection to this procedure.

Jury deliberations resumed the next morning, Friday November 8, at 8:57 a.m., and sometime before noon, the jury sent out another note asking, "What happens if a unanimous decision cannot be reached?" The trial judge stated that it was too early for an *Allen*[5] charge. Counsel for both sides concurred and agreed with the trial court's suggestion to send the jury a message to "keep deliberating." Accordingly, Woods's counsel agreed with this procedure. Later that afternoon, the jury sent the trial judge another

---

[5] *Allen v. United States*, 164 US 492 (1896).

note that read, "We are at an impasse, and it is being stated that no amount of deliberation will change the opinions." The trial judge told counsel that he intended to bring the jurors into the courtroom to tell them that they would be deliberating until 5:00 p.m., and if no verdict was reached, they would return Tuesday morning, after a long holiday weekend, to resume deliberations.

At this point, Woods's counsel moved for a mistrial "since this is the third time that [the jurors] have said something of this nature." The trial court summarily denied the motion but stated that he would give the jury an *Allen* charge on Tuesday if it did not reach a verdict. The trial court called the jurors back into the courtroom and told them:

> So, I know you've been deliberating for quite a while now. But we're going to—I'm just going to give you the schedule. We're going to probably go today until about five, and then we will be coming back on Tuesday— Tuesday morning at nine if you do not reach a decision today by five. Okay? So, I'm just giving you the schedule. And then we'll be back on our normal schedule for the rest of next week, with lunch at twelve and going to about five. Okay? All right. You're excused.

Woods's counsel did not object to these instructions, and the jury

then resumed its deliberations around 3:16 p.m. with the plan to cease deliberations around 5:00 p.m. No verdict was reached on Friday.

When the trial resumed on Tuesday, November 12, the jury continued its deliberations and reached a verdict later that day, in which the jurors found Woods guilty of malice murder, felony murder based on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony but acquitted him of the charges of felony murder based on armed robbery and armed robbery. The trial court conducted a poll of the jury, asking each juror, "Is this your verdict?" and "Is this still your verdict?" The jurors individually responded in the affirmative to both questions.

In denying Woods's motion for new trial on this ground, the trial court determined that the jury deliberated approximately 16 hours over three business days, which the court found was "not remarkable" in a murder case based on circumstantial evidence. It also concluded that the jury was not impermissibly coerced.

19

Woods asserts, however, that the trial court erred in directing the jurors to keep deliberating in spite of their notes indicating that they had not reached a unanimous decision and asking what would happen if they did not do so. He also asserts that the trial court's announcement of the schedule for deliberations for the following week of trial signaled to the jurors that a hung jury was not acceptable and that they were required to deliberate indefinitely until they reached a unanimous verdict.

The determination of whether a jury is hopelessly deadlocked is a sensitive one best made by the trial court that has observed the trial and the jury, *Bannister v. State*, 306 Ga. 289, 296 (2019) (quotation marks omitted), and a trial court's determination in that regard is subject to reversal only for an abuse of discretion. *Smith v. State*, 302 Ga. 717, 718 (2017) (quotation marks omitted). Moreover, the determination of "[w]hether a verdict was reached as the result of coercion depends upon the totality of the circumstances." Id. (quotation marks omitted). And this Court has considered the following in determining whether the trial court's decision to require

further deliberations amounted to coercion:

> the length of trial, the length of deliberations before the jury indicates that it is deadlocked, the language of the jury's notes, the progress of the jury, the language of the *Allen* charge and other instructions regarding deliberations, the length of additional deliberations after the alleged coercion, whether the jury found the defendant not guilty of any charges, and the polling of the jury.

*Smith*, 302 Ga. at 721.

In addition, trial judges are vested with broad discretion with respect to administrative or trial management instructions, and such discretion "will not be controlled by this court unless it is manifestly abused." *Edwards-Tuggle v. State*, 320 Ga. 558, 562–63 (2024) (quotation marks omitted). "The judge's discretion in controlling the conduct of a trial necessarily includes the power to determine the length of time the jury will be allowed to deliberate on a given day." Id. See also OCGA § 15-1-3 (4) ("Every court has power ... [t]o control, in the furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto[.]").

The trial in this case lasted for over three days, and the jury deliberated under four hours before sending the first message indicating that it was unable to reach a unanimous decision. The next day, deliberations continued for fewer than six hours before the jury sent its last note indicating that it was at an impasse. But at no point did the notes indicate that the jury was "hopelessly deadlocked." See *Bannister*, 306 Ga. at 296. At most, the final note indicated that the jury had reached an "impasse," and some person or persons stated that further deliberation "would not change opinions." But even if the jurors had indicated that they were "hopelessly deadlocked," see id., a trial court is not bound by such a pronouncement. "On the contrary, the trial court, in the exercise of a sound discretion, [is] required to make its own determination as to whether further deliberations were in order." *Sears v. State*, 270 Ga. 834, 838 (1999). After the third note, the trial court instructed the jury as to what the schedule for deliberations would be for the remainder of the day and into the following week if necessary. The trial court never gave an *Allen* charge. And when the jury reached

22

its verdict, it found Woods not guilty on two counts. Each juror confirmed the verdict when polled by the trial court.

Considering the totality of the circumstances, the trial court's instructions to the jurors after receiving their notes were not impermissibly coercive, and, therefore, it did not abuse its discretion in giving those instructions. See *Porras v. State*, 295 Ga. 412, 420 (2014) (determining that the trial court's instructions were not "coercive simply because they compelled the jury to continue deliberating after it reported a deadlock"). And the trial court's instructions setting out the schedule for future deliberations cannot be understood as forcing the jury to reach a unanimous verdict as Woods contends. "Rather, the court's statements constituted administrative guidance for the jury concerning how long they would likely be deliberating that evening and in the coming days, guidance that clearly fell within the wide discretion afforded trial judges in managing their courtrooms." *Edwards-Tuggle*, 320 Ga. at 563.

Therefore, Woods failed to establish that the trial court erred,

much less that it clearly and obviously erred, in responding to the jury's notes, and because Woods failed to establish at least one of the elements of plain error, his claim fails. See *Sellers v. State*, ___ Ga. ___ (2026), S25A1044, slip op. at 12 (Ga. Jan. 5, 2026) (2026 WL 20439) (holding claim of plain error in trial court's jury instruction fails because Appellant failed to show clear and obvious error in giving a jury charge).

3. Woods further asserts that if we identify error based on the arguments above, but find that any such error was harmless, we should review the cumulative effect of both errors.

"To establish cumulative error[,] [an appellant] must show that (1) at least two errors were committed in the course of the trial; [and] (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [the appellant] a fundamentally fair trial." *State v. Lane*, 308 Ga. 10, 21 (2020) (quotation marks omitted). Here, we assumed error on Woods's argument that the trial court abused its discretion in admitting evidence of the May 21 incident but concluded that such

24

error was harmless. And we identified no error in the trial court's instructions to the jury during their deliberations. Accordingly, because Woods failed to show more than one error at trial, this Court has no errors to aggregate for purposes of a cumulative error analysis. Woods's argument on this ground fails. See *Flood v. State*, 311 Ga. 800, 808–09 (2021).

*Judgment affirmed. All the Justices concur.*